### PEOPLE *v.* EMMONS.

**1.** CRIMINAL LAW—EVIDENCE — OPINION EVIDENCE—INTOXICATING LIQUORS..

On the trial of a respondent charged with selling fermented cider in violation of the local option law, the court did not err in permitting a farmer who was familiar with apple growing and with the popular terms applied to cider in the process of aging, to give his opinion as a witness that the cider which he had drunk was fermented.

**2.** SAME—INTOXICATING LIQUORS—CIDER.

Hard cider commonly means fermented cider. Cider includes, in a popular sense, the expressed juice of the apple before and after fermentation, but in law and commerce cider is applied only to the fermented juice of apples. It is a vinous or fermented liquor.[1]

**3.** SAME—INSTRUCTIONS—TRIAL.

The court did not commit reversible error in charging the jury that the sale of fermented cider was a violation of law without stating the exact or scientific measure of fermentation.

**4.** SAME—INTENT—LOCAL OPTION.

Intent is not a necessary element of the offense of selling prohibited liquors in a county in which the local option law is in force.

**5.** SAME—COLLATERAL ISSUE—EVIDENCE.

The respondent was, however, entitled to offer evidence that the parties who bought cider from him had whisky in their possession, and that they had the means and opportunity to adulterate the cider after he sold it, in support of his defense that the beverage was not fermented. He should not have been limited to the cross-examination of the witness for the prosecution.

Exceptions before sentence from Clinton; Searl, J.

[1] On the question whether cider is an intoxicating liquor, see note in 20 L. R. A. 648.

Submitted November 7, 1913. (Docket No. 165.) Decided December 20, 1913.

Elmer E. Emmons was convicted of violating the law relative to the sale of intoxicating liquors in a county that had adopted prohibition. Reversed.

*Edward J. Moinet,* Prosecuting Attorney, for the people.

*J. Earle Brown* and *Dean W. Kelley,* for respondent.

STEERE, C. J. At the January term, 1913, of the circuit court of Clinton county, respondent was convicted, by the verdict of a jury, under an information charging that on August 30, 1912, at the city of St. Johns, in said county, he unlawfully sold to one Charles Lance "a certain quantity of malt, brewed, fermented, spirituous liquor, to wit, two gallons of cider." The provisions of the local option law are, and then were, in force in said county. No question is, nor so far as the record discloses can be, raised as to the sufficiency of the information or regularity of the proceedings leading up to the trial of defendant, and the case is removed to this court for review upon exceptions before sentence directed against certain alleged errors made during the trial, in the admission and rejection of testimony and in charging the jury.

The purchase of two gallons of cider by Lance from respondent at the time and place charged is admitted. It is denied that it was fermented, spirituous, or intoxicating liquor. The prosecution claimed that it was fermented and its sale forbidden, within the terms of the statute. This raised the single and controlling issue litigated and submitted to the jury. Upon that question of fact an abundance of conflicting testimony, scientific and otherwise, was intro-

duced, within the range of which it was possible for the jury to find, according as the testimony convinced, either that the beverage in question was a sweet, pleasant, and innocuous combination of water, sugar, and boiled cider properly blended by stirring with a stick, free from alcohol and innocent of fermentation, or that it was distinctly fermented and contained a liberal percentage of alcohol, being what is known as hard cider which had "worked," and was yet capable of working definite results, objectionable in a temperance community, if liberally indulged in. Respondent owned a cider mill in the suburbs of St. Johns, where he engaged in the cider and vinegar business. Lance resided with his family in Washington township, Gratiot county. A brother named James Lance and two brothers-in-law named James and John Baum, who were witnesses in the case, also resided in the same neighborhood.

The prosecution's testimony tended to show that on the day in question Charles and James Lance and James Baum went over the border into Clinton county and visited St. Johns on business missions. Charles Lance rode with James Baum, who was taking to that city a load of lambs carried in his lumber wagon. These they delivered at the stockyards near respondent's cider mill. They reached the city about noon, and after unloading the lambs drove to a feed barn, where the team was left during the afternoon while they remained in the city. Charles Lance met his brother James, who had driven in with his conveyance, and they together visited the stockyards. From there they went to respondent's cider mill near by. James bought a quart of cider which they drank together. This was not bought from respondent, but from an employee at the mill. Later in the day they again visited the mill, and James then bought a quart of cider from respondent, which they also drank. Charles was by this time so favorably impressed with

the beverage that he asked for and obtained a two-gallon jug of it. Being assured on inquiry that it was of the same quality as that they had been drinking, he paid for it. He and James, on sampling the contents of the jug later, pronounced the quality similar to if not identical with that they had previously partaken of. Charles Lance and James Baum drank from the jug during the afternoon and on the way home that evening events so shaped themselves that on their return the team was cared for by Mrs. Charles Lance, who drove it down to her brother John Baum's place. John, who stated he did not drink, secured the jug from the wagon the next morning, took the cork out, and smelled but did not taste. He testifies, "It smelled like vinegar or something like that." He put it temporarily in a cool place, and in the afternoon delivered it to the sheriff, who tasted it and then delivered it to Dr. Holm, the State bacteriologist. His analysis, made September 3d, showed 7.95 per cent. of alcohol by volume and 6.4 by weight. He, Charles and James Lance, James Baum, and the sheriff all testified that it was fermented hard cider and had worked.

In behalf of the defense, the keeper of the feed barn testified he had a drink from the jug and it was sweet cider, quite as fresh and unfermented as though it had just come from the press.

Respondent gave testimony that the jug contained sweet cider, of his own compounding and not fermented, drawn from a 14-gallon keg. He testifies:

"I recall Charles Lance buying a jug of cider at my place the 30th day of August; it was on Friday. I know where the cider that he bought came from. It was cider made from boiled cider, sugar, and water. The boiled cider was made the fall before. The cider that I sold Lance on Friday was prepared on the Monday before. I got the boiled cider from which I made this cider that I sold out of a large, galvanized, iron

hooped barrel, * * * filled with boiled cider when hot the fall before and bunged up. On this Monday before the 30th day of August, I used two gallons of the boiled cider from this barrel. I put it into a 14-gallon keg with common iron hoops. The keg was cleansed before I used it. It was rinsed with cold water, thoroughly cleaned every time it is used, and then rinsed with a solution of benzoate of soda, but none left in the keg, all drained out. I am talking about this particular time. After the boiled cider was put in this 14-gallon keg, there was put in five pounds of sugar, filled the barrel nearly full with water, and stirred it good with a stick we have on purpose. We used H. & E. sugar; that is the brand I bought; H. & E. granulated sugar."

His testimony was substantiated by the employee who sold the first quart to James on the same day. Respondent also testified he "got wind" that he was accused of making an unlawful sale to Lance shortly after the day in question, and before the contents of the keg were all gone, there being "three or four jugs left out of that batch;" that he took a sample of it and gave some to others who, being called as witnesses, testified that the cider given them was sweet and unfermented. Respondent is not, however, shown to have preserved any of "that batch" for scientific analysis; but he later took to Dr. Clarke, teacher of chemistry at the Agricultural College, a can of boiled cider which he testified was taken from the barrel out of which that used in compounding the sweet cider sold to Lance was taken. Testimony was given that with this a measure of liquid was mixed, according to respondent's formula for sweet cider, of the same ingredients, in the same temperature, and kept for the same length of time as that sold Lance. Of this liquid the doctor testified in substance that it was unfermented, and that such a mixture when properly compounded would not ferment.

The two doctors, called by the respective sides as experts, were asked lengthy hypothetical questions,

examined, and cross-examined critically as to processes of fermentation and scientific tests of apple juice for alcohol and other properties.

The testimony of the nonexpert witnesses who made their nontechnical tests by the simple processes of smelling and tasting the contents of the jug, or keg, consisted of plain and direct statements that the beverage was or was not fermented, sweet, strong, or hard cider. On direct examination Charles Lance was asked: "Q. Was that cider fermented?" Objection was made to the question as incompetent. The court said:

"The ordinary man that lives on a farm, I think, can tell whether cider is fermented if he drinks it. He may answer."

Error is assigned on this ruling. Counsel for respondent state that—

"Under the theory of respondent in this case, the question called for an expert conclusion, and the witness was not able under the showing to make competent answer to that question."

The witness had previously testified without objection that "it was fermented cider; I would call it strong cider." After the objection, the witness gave his understanding of fermented cider to be that it had worked, and that this was hard cider. We have no hesitation in holding that a farmer of average intelligence, who has resided for years on a farm with his family in the apple growing regions of Southern Michigan, and who shows familiarity with the popular terms applied to cider in its process of aging, is competent to testify upon the subject; the weight of his testimony being for the jury.

In common meaning "hard cider" is "fermented cider." In *Eureka Vinegar Co.* v. *Printing Co.* (C. C.), 35 Fed. 570, it is said:

"In a popular sense, the term 'cider' includes the

expressed juice of apples, either fermented or unfermented, and hence the terms 'sweet cider' and 'hard cider' are in popular use to distinguish between the juice of the apple before and after fermentation. In strictness, the juice of the apple before fermentation is simply apple juice, and it is only by fermentation that it becomes cider; and, when the word 'cider' alone is used in law or commerce, it is commonly understood to mean the fermented juice of apples. * * * The quantity of alcohol in vinous or fermented liquors is variable, but the average per cent. is common knowledge. * * * I have looked with some care through a great many special acts of prohibition, and have not found one under which an alcoholic, vinous, fermented, or intoxicating liquor can be lawfully sold as a beverage. * * * All the acts include alcoholic, vinous, and fermented liquor, and cider falls under all of these heads. It is also an intoxicating liquor, for it is common knowledge that a fermented beverage which contains from 5 to 10 per cent. of alcohol, which is freely drunk by the glassful, will produce intoxication. This is a fact of daily observance in communities where such beverages are sold. Whisky contains from 40 to 50 per cent. of alcohol, and cider contains one-fifth as much alcohol as whisky, so that drinking a pint of cider is equivalent to drinking one-fifth of a pint of whisky; but to bring it under the operation of the liquor laws of the State it is not essential that it should be an intoxicating liquor. It is enough that it is a 'vinous or fermented liquor.' "

The foregoing is in harmony with the utterances of this court in passing upon our own statute. *People* v. *Foster*, 64 Mich. 715 (31 N. W. 596); *People* v. *Adams*, 95 Mich. 541 (55 N. W. 461); *People* v. *Ingraham*, 100 Mich. 530 (59 N. W. 234); *People* v. *Kinney*, 124 Mich. 486. (83 N. W. 147); *People* v. *Hickman*, 164 Mich. 672 (130 N. W. 331).

We think the charge of the court, to various parts of which error is assigned, followed the spirit of the foregoing decisions. The chief complaint of the charge apparently is that the court did not more fully,

scientifically, and technically explain the meaning of the word "fermented" as used in the statute, nor designate definitely the degree or point of fermentation which must be reached to make a sale unlawful. The trial court used in that connection the language approved by this court in *People* v. *Kinney, supra,* and also said:

"You must not understand from that portion of my charge that, simply because there might have been some slight amount of ferment in the cider at the moment it came from the press, that would make it an unlawful sale. But you will see from what I have said to you that it means what we commonly call fermented cider; you understand that. If it is sweet cider, unfermented cider, he had a right to sell it; if it was not that kind of cider, but was fermented cider, then he had no right to sell it and it is against the law."

The charge, taken in its entirety, was sufficient and not misleading. Even if respondent's contention that an exact degree, or scientific standard, of fermentation is necessary to be declared in order to protect the legitimate and honest industry of cider making, it is for the legislature and not the courts to fix the standard. The common meaning and popular understanding of "fermentation" in its application to aging cider, as explained in the charge quoted and approved in the *Kinney Case,* and as followed by the trial court in this case, is presumptively the legislative meaning, and is a sufficient statement of standard under the statute. In *People* v. *Adams, supra,* this court said:

"The jury were properly instructed that, if the cider sold was fermented, the respondent should be convicted. The statute prohibits the sale of fermented cider, and forecloses inquiry as to whether cider which is fermented is intoxicating, whatever the stage of fermentation."

This rule was again recognized in *People* v. *Hickman, supra,* as follows:

"Under the statute, evidence that the cider kept for sale was fermented liquor was sufficient without proof that it was intoxicating."

Error is assigned on rulings of the court sustaining objections to questions asked by respondent's counsel as to his knowledge, intention, and motives, and instructions given his employee relative to the sale of fermented cider. The rulings complained of are in harmony with previous decisions of this court. The questions of motive and intent are not involved. Intent is not made an ingredient of the offense charged and does not become the subject of evidence. The last utterances of this court upon that question, with citations of previous decisions, are found in *People* v. *Hatinger*, 174 Mich. 333 (140 N. W. 648), and *People* v. *Worges*, 176 Mich. 685 (142 N. W. 1100).

Numerous other errors are assigned on, and serious complaint is made of, various rulings and remarks of the court during the progress of the trial which it is urged disclosed views of the court belittling the testimony of certain of defendant's witnesses and excluded material evidence essential to a full development of defendant's theory of the case; it being said in counsel's brief—

"That the accused was not permitted to have a fair and impartial trial because of the several rulings of the trial court which improperly restricted and hampered him in presenting evidence to the jury upon which his theory of the case could be and was founded."

In its omnibus form this complaint is unwarranted by the record. With one unfortunate exception the rulings of the court gave ample latitude to the evidence offered by both sides, including the technical elaboration with which the case was freighted and dignified.

The exception which we are constrained to conclude deprived respondent of a substantial right and

entitles him to a new trial is as follows: It was his claim and testimony that the jug of cider he sold Lance was sweet, free from intoxicating properties, and unfermented; and that it would not ferment without other ingredients added, particularly in the short time between when it was sold and when it was analyzed by Dr. Holm; that, if it then contained the percentage of alcohol which the doctor found, alcohol was added to it by some one from an external source after it left respondent's hands. The prosecution did not attempt to prove that Lance and James Baum, who drove home together with the jug in their wagon and drank from it, were intoxicated, though some of their testimony suggested as much. Baum, being asked, by the prosecuting attorney who drove the team on the way home, testifies:

"Lance and I were both on the seat and had the jug right between us. * * * I was in the wagon, but I don't suppose much of anybody drove them. * * * I left the team at my sister's place. * * * My sister took the team down to my brother John's place."

On cross-examination Baum testified that he had been drunk lots of times, and that when they left for home that evening he was "feeling good" and "quite drunk." Under objection he was asked if he did not have a bottle of whisky at the feed barn and offer a drink to Burnham, the keeper of the barn, and if he did not have it with him wrapped up in paper when they started home? This he denied. Lance, being also questioned on the subject, answered in the negative. As a part of the defense, Burnham was called and interrogated upon the same subject; but, objection being interposed by the prosecution, he was not allowed to testify. It was urged by the respondent that, in substantiation of his theory of the case, it was competent to show, and he offered to show, as part of the *res gestæ*, that the parties had, and in-

dulged in, whisky on the same afternoon they were drinking this cider, and that they left the barn taking with them together the jug of cider and a bottle of whisky, thus showing the means, opportunity and probability of their adding alcohol to the cider, to blend a more palatable drink by putting the contents of the whisky bottle into the jug. The prosecution contend, although it might be competent to interrogate the witnesses on the subject in cross-examination, that this was a collateral matter and the defense was bound by their answers. If it was collateral matter, this is true; but we think it was more, under respondent's theory and claim. It was competent for either the prosecution or defense to show, as a part of the *res gestæ,* that these parties were intoxicated the afternoon they bought the cider and the means by which they became so. From the time the jug of cider left respondent's hands, at which time he claims it was sweet and unfermented, until after midnight that night, it was in possession of Baum and Lance. As bearing upon his claim that it was adulterated by others, evidence that the buyers, while drinking freely from it, had conveniently with them alcoholic liquor with which to mix and strengthen it, was unquestionably competent testimony in support of respondent's claim.

This was within the well-recognized rules of circumstantial disproving evidence, by which a denying defendant is allowed to support his claim that the offense, if committed at all, was the act of others, by showing that another had at the time charged available means, opportunity, and motive to do that which the accused denies doing. Such evidence is correlative with the hypothesis it is sought to support, and the weight of the exculpatory inference is for the jury.

It is elementary that the theory of the defense, when supported by competent evidence, should be left

to the jury, and the evidence excluded was competent in support of respondent's theory. The strength of the inferences to be drawn from it and the degree of belief it carried were questions within the province of the jury.

For the reason stated, we are constrained to hold that the conviction must be set aside and a new trial granted.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRAN-DER, and BIRD, JJ., concurred.